# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| JASON JORDAN,                 ) | |
|             ) | |
|          Plaintiff,     ) | |
|             ) | |
|             ) | |
| vs.                    ) | CASE NO. 3:05-0513 |
|             ) | JUDGE CAMPBELL/KNOWLES |
|             ) | |
| TYSON FOODS, INC., TYSON FOODS ) | |
| INC. GROUP HEALTH PLAN, IBP,   ) | |
| inc., and IBP WELFARE BENEFITS   ) | |
| PLAN,             ) | |
|             ) | |
|          Defendants.    ) | |

## REPORT AND RECOMMENDATION

### I.  Introduction and Background

This matter is before the Court upon Plaintiff's "Motion for Judgment on the Administrative Record" (Docket No. 37), and Defendants' "Cross Motion for Judgment on the Merits" (Docket No. 47).  These Motions have been referred to the undersigned by Judge Campbell for a Report and Recommendation.  Docket No. 68.  For the reasons discussed below, the undersigned recommends that Plaintiff's Motion (Docket No. 37) be DENIED, and that Defendants' Motion (Docket No. 47) be GRANTED.

Plaintiff is a former employee of Defendant IBP, inc.,[1] and its successor Tyson Foods, Inc.  Plaintiff's original Complaint, which was filed against Defendants Tyson Foods, Inc., and Tyson Foods, Inc. Group Health Plan, stated in pertinent part as follows:

---

[1]  The "i" in the abbreviation "inc." is not capitalized.

This case is brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") (as amended).  Briefly stated, Plaintiff was a participant in the Tyson Foods, Inc. Group Health Plan.  In October 2002 Defendants removed him from the Plan while he was on a medical leave of absence.  Thereafter, Defendants failed to give him COBRA-complaint[2] notice of his right to elect continuation of coverage and refused his requests for reinstatement and to elect continuation of coverage.  Defendants did not provide Plaintiff with a COBRA-complaint notice of his right to elect continuation of coverage until April 28, 2005.  Plaintiff seeks statutory damages and equitable relief as a result of his premature disenrollment from the Plan and Defendants' failure to comply with the COBRA notice and election requirements integrated into ERISA.

Docket No. 1, ¶ 1 (footnote added).

In their Answer, Defendants stated the crux of their defense as follows:

Plaintiff was a full-time employee of IBP, inc., from April 23, 2001, until IBP, inc., was acquired by Tyson Foods, Inc., at which point he became a full-time employee of Tyson Fresh Meats, Inc., a subsidiary of Tyson Foods, Inc., until his termination on January 31, 2003.  IBP, inc., was the Plan sponsor and Plan Administrator of the IBP Welfare Benefits Plan ("IBP Plan").  The Plan at issue, the Tyson Foods, Inc., Group Health Plan, is the successor to the IBP Plan.  Plaintiff was a covered employee of the IBP Plan pursuant to its terms.  Plaintiff began a medical leave of absence on June 6, 2002.  Pursuant to the terms of the IBP Plan, an employee on a medical leave of absence had the obligation to pay health insurance premiums if he wanted health insurance benefits to continue during the leave.  Plaintiff did not make these payments.  On October 1, 2002, the Plan, sponsored and administered by Tyson Foods, Inc., became effective.  Pursuant to Tyson policy, any employee whose premium payments were in arrears was not eligible for enrollment in the Plan.  Plaintiff was not a participant or covered employee in the Plan because he was not eligible for enrollment in the Plan.

Docket No. 5, p. 1-3.

_____

[2] COBRA is the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161, *et seq.*

2

In their Answer, Defendants further averred that Plaintiff was terminated from his employment effective January 31, 2003, "when he abandoned his job by not returning to work when his leave of absence ended." *Id.*, p. 3. Additionally, Defendants averred that Plaintiff's termination from employment was not a "qualifying event" under COBRA, because Plaintiff was not a participant or a covered employee in the Plan at the time of his termination. *Id.* Defendants further stated that they "had no obligation to provide Plaintiff with a COBRA-complaint notice of his right to continue benefits regarding their alleged October 1, 2002 'disenrollment' of him because Plaintiff's failure to pay premiums for medical coverage under the IBP Plan rendered him ineligible for enrollment in the Plan sponsored by Tyson Foods, Inc., which became effective October 1, 2002." *Id.*

Following the filing of Defendants' Answer, Plaintiff filed a "Motion to Amend his Complaint." Docket No. 13. That Motion was granted without opposition. Docket No. 21. Plaintiff's "Amended Complaint" added two additional Defendants: (1) IBP, inc., and (2) the IBP Welfare Benefits Plan ("IBP Plan"). Plaintiff's Amended Complaint contained the following "Statement of the Case":

> Plaintiff asserts several ERISA violations in this matter. He complains that Defendants are liable to him for wrongfully terminating him from the Tyson Plan retroactive to his date of enrollment in the Tyson Plan, and he complains that Defendants failed to give him a Cobra-complaint notice of his right to continue coverage after he was terminated from the Tyson Plan. Defendants maintain that Plaintiff was never terminated from the Tyson Plan because he was never eligible to enroll in the Tyson Plan. Therefore, and in the alternative, Plaintiff complains that Defendants wrongfully failed to give him a COBRA-complaint notice of his right to elect continuation of coverage upon his termination from the IBP Plan. Plaintiff complains that money was deducted from his short-term disability benefits, as premiums for the Tyson Plan and that Defendants have failed to return these

3

funds to him in violation of their duties under ERISA.

Docket No. 22, p. 1-2.

Plaintiff's Amended Complaint also contained the following allegations. On or about June 4, 2002, Plaintiff became unable to perform his job with IBP because of "mental problems," and he took a medical leave of absence pursuant to IBP's short-term disability policy. *Id.,* p.3. Under the IBP Plan, employees on short-term disability were expected to make premium payments for continued benefits under the IBP Plan through a voucher-type payment system. *Id*. As part of this voucher-type premium payment system, the "local subsidiary"[3] would mail a set of vouchers to the employee on short-term disability. *Id*. On or about August 9, 2002, "Plaintiff's employer" (presumably IBP) mailed an IBP Plan coupon book to Plaintiff at 605 Walton Ferry Road, Hendersonville, Tennessee. *Id*., p. 4. Unfortunately, Plaintiff had not lived at that address since 2001. *Id*. Plaintiff averred that "Defendants" (presumably referring to IBP and/or the IBP Plan) knew on or before January 4, 2002, that Plaintiff was living at 107 Camino Circle, Hendersonville, Tennessee. *Id*. Plaintiff further averred that, on or about July 17, 2002, "Plaintiff's employer" (presumably IBP), had mailed correspondence to Plaintiff at 605 Walton Ferry Road, and that correspondence was returned by the U.S. Postal Service as undeliverable on or about August 2, 2002. *Id*. Thus, after August 2, 2002, Defendants knew that mail sent to Plaintiff at the Walton Ferry Road address was undeliverable. *Id*.

The Amended Complaint further averred that, on or about October 4, 2002, Plaintiff

---

[3] Plaintiff does not discuss the meaning of the term "local subsidiary," although the Court notes that Plaintiff was employed at Defendants' Goodlettsville plant. IBP refers to its Corporate Headquarters as being in Dakota Dunes, South Dakota. The Corporate Headquarters of Tyson Foods, Inc., is in Springfield, Arkansas. Docket No. 2, p. 2.

4

enrolled in the Tyson Plan "as part of the conversion of former IBP employees to the Tyson Plan." *Id.* He averred that, thereafter, "Defendants" deducted premiums for the Tyson Plan from Plaintiff's short-term disability benefits. *Id.*, p. 5. While Defendants characterized these deductions or withholdings as having been "inadvertently deducted," Defendants never returned these funds to Plaintiff. *Id.*

Plaintiff further averred that, in November 2002, he was "disenrolled" from the Tyson Plan retroactive to October 1, 2002. *Id.* "Defendants" never sent Plaintiff a notice regarding his disenrollment from the Tyson Plan. *Id.* Plaintiff averred that his "termination" from the Tyson Plan was a "qualifying event" under COBRA in regard to his right to continue coverage under the Tyson Plan. *Id.* Plaintiff noted that Defendants' position was that Plaintiff's termination from the Tyson Plan did not constitute a "qualifying event" because Plaintiff was never eligible to enroll in the Tyson Plan. *Id.* Plaintiff stated that, if Defendants were correct in that position, then the COBRA "qualifying event" occurred when Plaintiff was terminated from the IBP Plan. *Id.* Plaintiff averred, however, that "Defendants" (presumably IBP and/or the IBP Plan) did not provide Plaintiff with a timely COBRA-complaint notice of his right to continue benefits after he was terminated from the IBP Plan. *Id.*

Plaintiff subsequently learned that he had no health care coverage in December 2002, when his treating physician declined to provide further services pending payment of several thousand dollars in unpaid medical bills. *Id.* Plaintiff averred that, when he "learned that he had no health insurance he was forced to forego needed medical treatment because he could not afford the treatment without insurance." *Id.*, p. 6. He averred that, when he learned he had no health insurance, "he protested that fact and attempted to be reinstated (or enrolled as Defendants

5

would have it) in the Tyson Plan." *Id.* "Defendants" (presumably Tyson and/or the Tyson Plan) "refused Plaintiff's request to be reinstated (or enrolled) in the Tyson Plan." *Id.* Plaintiff averred that he also attempted to exercise his right to elect continuation of coverage under COBRA after he was terminated from employment, but "Defendants" again (presumably Tyson and/or the Tyson Plan) "also refused Plaintiff's request to elect COBRA continuation coverage." *Id.*

The nature of the relief sought by Plaintiff in this action is critical to the Court's analysis of the issues and arguments made by the parties and, therefore, the Court will quote below the "Liability and Damages" section of Plaintiff's Amended Complaint:

> <u>Liability and Damages based on Plaintiff's Termination from the Tyson Plan.</u>
>
> 54. Plaintiff seeks statutory and remedial relief pursuant to 29 U.S.C. § 1132(c)(1) in the form of an award of $110 for each day of Defendant's [*sic*] ongoing failure to provide Plaintiff with a COBRA-complaint notice of his right to continuation of benefits under the Tyson Plan.
>
> 55. Plaintiff seeks equitable relief in the form of an Order instructing Defendants to permit Plaintiff to elect to enroll in the Tyson Plan as an eligible employee effective October 1, 2002 pursuant to the terms of that Plan.
>
> 56. Plaintiff seeks equitable relief in the form of an Order instructing Defendants to permit Plaintiff to elect to continue his coverage under COBRA as of the date he would have otherwise been terminated from enrollment in the Tyson Plan (*i.e.*, the date of his Tyson Plan "qualifying event").
>
> <u>Liability and Damages Based on Plaintiff's Termination from the IBP Plan.</u>
>
> 57. Plaintiff seeks statutory and remedial relief pursuant to 29 U.S.C. § 1132(c)(1) in the form of an award of $110 for each day Defendants failed to provide him with a COBRA-complaint notice

6

for the period running from the termination of his enrollment in the IBP Plan until April 28, 2005.

58.  Plaintiff seeks statutory and remedial relief pursuant to 29 U.S.C. § 1132(c)(1) in the form of an award of $110 for each day Defendants failed to provide him with the information and material required to maintain his enrollment in the IBP Plan while on short-term disability.

59.  Plaintiff seeks equitable relief in the form of an Order instructing Defendants to permit Plaintiff to elect to continue his coverage under COBRA as of the date he was terminated from the IBP Plan (*i.e.,* the date of his IBP Plan "qualifying event").

60.  In the alternative, Plaintiff seeks equitable relief in the form of an Order instructing Defendants to permit Plaintiff to enroll in the Tyson Plan as of the conversion date to that Plan from the IBP Plan and also instructing Defendants to permit Plaintiff to elect to continue his coverage under COBRA as of the date he would have been terminated from the Tyson Plan.

Liability and Damages based on Defendants' failure to return Plaintiff's funds.

61.  Plaintiff seeks equitable and injunctive relief in the form of an Order compelling Defendants to return to Plaintiff the "inadvertent deductions" that were withheld from Plaintiff's short-term disability benefits.

62.  Plaintiff seeks statutory and remedial relief pursuant to 29 U.S.C. § 1132(c)(1) in the form of an award of $110 for each day of Defendants' ongoing failure to return the "inadvertent deductions" that were made from Plaintiff's short-term disability benefits.

63.  Plaintiff seeks statutory and remedial relief pursuant to 29 U.S.C. § 1109 in the form of an award of $110 for each day of Defendants' ongoing failure to return the "inadvertent deductions" that were made from Plaintiff's short-term disability benefits.

Additional Damages and Relief.

64.  Plaintiff seeks all other forms of equitable and statutory relief available to him under ERISA including attorney fees, an award

for all costs associated with this matter, injunctive relief finding the Defendants violated his rights under ERISA and enjoining them from any further violations, and any other remedies deemed necessary and appropriate by this Court.

Docket No. 22, p.7-9.

In the instant "Motion for Judgment on the Administrative Record," however, Plaintiff seeks only the following relief:

Plaintiff hereby respectfully asks the Court to issue a Judgment on the Administrative Record in favor of the merits of his claims and thereafter to Order appropriate equitable, statutory and remedial relief to include:

Plaintiff asks for an Order pursuant to 29 U.S.C. § 1132(c)(1)(A) instructing Defendants to pay statutory and remedial relief in the amount of $95,700 for their ongoing failure to provide Plaintiff with a timely COBRA notice.

Plaintiff asks for an Order pursuant to 29 U.S. C. § 1109(a) instructing Defendants to pay $88,400 in statutory and remedial relief for wrongfully withholding and retaining premiums from Plaintiff's short-term disability benefits, and instructing them to return to Plaintiff the $427.17 they improperly withheld from him.

Plaintiff asks for an Order pursuant to 29 U.S.C. § 1132(a)(1)(B) remanding this matter to the Administrator to determine and resolve all unpaid benefits payable under either Plan through January 31, 2003. Plaintiff further asks for this Court to retain jurisdiction over this aspect of Plaintiff's complaint until Defendants are able to provide a final and complete account of all claims submitted and paid.

Plaintiff asks for an Order pursuant to 29 U.S.C. § 1132(a)(1)(B) instructing Defendants to give a COBRA-complaint notice to Plaintiff of his right to elect continuation coverage beginning February 1, 2003.

Plaintiff asks for an Order pursuant to 29 U.S.C. § 1132(g) instructing Defendants to pay Plaintiff's legal fees and costs in this matter subject to such additional proof and evidence this Court might require.

8

> Plaintiff asks this Court for any other equitable, statutory or
> remedial relief as this Court deems necessary and appropriate.

Docket No. 37, p. 1-2.

Defendants have filed a "Response to Plaintiff's Motion for Judgment on the

Administrative Record and Cross-Motion for Judgment on the Merits." Docket No. 47.[4]

Defendants' Response contains the following "Introduction":

> This case presents a simple issue: whether a Plan Administrator
> should be liable for a former employee's failure to meet his own
> obligations. Plaintiff, Jason Jordan ("Jordan"), has tried to argue
> that it was Tyson's fault that he lost his health insurance coverage.
> The missing link in his argument, however, is the fact that he
> failed to pay for his health insurance coverage. The benefit plans
> at issue required an employee to pay premiums in order to get and
> keep health insurance coverage. When the employee was working,
> his premiums were automatically deducted from his pay check.
> When he was on an authorized leave of absence, he still had a duty
> to pay his premiums in order to retain coverage. When Jordan
> went on an authorized leave of absence, he never paid those
> premiums. Even after learning exactly how much he needed to pay
> to reinstate his coverage, he failed to do so. Once his coverage
> lapsed, Tyson gave Jordan every opportunity to pay the necessary
> premiums in order to reinstate his coverage. They issued several
> decisions in his favor. They offered him the opportunity to
> reinstate his coverage at the premium rate given covered
> employees under the respective plans. When he refused to pay
> those premiums, they offered him continuation coverage under the
> Consolidated Omnibus Budget Reconciliation Act ("COBRA") at
> the higher COBRA premium rates. Jordan never paid those
> premiums. Jordan had every opportunity to make himself "whole"
> by paying the requisite premiums that he should have paid in the
> first place, and yet he never did so. Rather, he chose to file suit.

Docket No. 47, p. 1-2.

_____

[4] Docket No. 47 is comprised of 54 pages. That document is a "combination" of Docket Nos. 44 and 45. For convenience, the Court will cite to Docket No. 47.

## II.  Facts[5]

Plaintiff began full-time employment with IBP, inc., on April 23, 2001.  As an IBP

employee he enrolled in the IBP Plan.  The IBP Plan was in effect until September 30, 2002.

Required contributions for the Plan were automatically withheld from an employee's pay check.

An employee on an approved leave of absence could have his coverage under the IBP Plan

continued under the following Plan provision.

> **Leave of Absence.**
> Subject to the FMLA leave provisions discussed below, you may
> continue coverage (including independent coverage) for up to
> twelve continuous months while on an approved medical leave,
> and for one month in the case of personal leave.  Applicable
> contributions must continue to be made to the Plan in order to
> retain coverage during your leave of absence.  If you do not return
> to work at the end of the approved leave period, then your
> coverage will terminate, unless continued in accordance with the
> COBRA continuation provisions.

Docket No. 47, p. 4, *quoting* AR 0135.

The FMLA provisions referred to above state in part as follows:

> If you choose to continue coverage while on an approved leave
> made available under the Family and Medical Leave Act
> ("FMLA"), you may do so by paying any required contributions
> that would have been paid if you had been working.  *If you fail to
> pay any required contribution, coverage will terminate on the last
> day of the period for which contributions were paid.*

AR 0135 (emphasis added).

Under these provisions, a covered employee on an approved medical leave could extend

his health insurance coverage for an additional twelve months, if he paid his monthly premiums

---

[5]  In support of their arguments, Defendants offer the following facts, which are generally
cited to the Administrative Record.  Additionally, Plaintiff has filed a Reply, which does not
challenge these facts, except as discussed below.

of $40.17 per month. If he did not pay the premiums, however, his coverage would terminate on the last day of the period for which contributions were paid.

If an employee is actively working, he receives a pay check from which deductions are automatically taken. If he is on a leave of absence, however, he does not receive a pay check. He is, however, still responsible for paying his monthly premiums.[6]

IBP, inc. had an established procedure, specifically set out in the Employee Benefits Procedure Manual, that apparently was set up to "remind" employees on leave to pay their monthly premiums. The Manual provides that when an employee is on a medical leave of absence, a member of the Goodlettsville Plant Personnel Department would enter the date the employee's leave of absence in the Plan's Human Resources System. The employee record would be sent to the corporate headquarters, where it would be entered in a corporate leave of absence tracking system. AR 0358.

Once an employee is on leave for 30 days, the Corporate Benefits Department would send a coupon book of eleven coupons (one for each month the employee could continue coverage, less the initial thirty (30) days) to the employee's home. The coupon book would usually be sent by certified mail, along with a copy of a letter stating the following:

> You recently began an authorized leave of absence from your employment with IBP, inc. You will be allowed to continue your benefit coverage while you are on the leave of absence by making monthly contribution payments to IBP, inc. If you do not make monthly payments during your leave, your coverage will lapse

---

[6] As will be discussed in greater detail below, Plaintiff was not receiving a regular pay check during his leave of absence. During that time period, however, Plaintiff applied for and also received short term disability benefits. Those benefits were paid to Plaintiff, by Defendant, by means of a weekly check, that was sent to Plaintiff from the Administrator of the short term disability program, Wellmark Administrators, Inc. *See* discussion at p. 15-18, infra.

11

> starting one month after your leave began. A lapse means that
> claims are not payable, new health conditions could be considered
> pre-existing and dental coverage percentages could decrease.
> Payment for the first four (4) weeks will be held in arrears and will
> be deducted from your payroll check when you return to work.
>
> Enclosed is a coupon booklet for remittance of the monthly
> payments. Each page of the coupon booklet indicates
>
>   Due date of your payment
>   Coverage period of your payment
>   Payment number
>   Type of coverage you may continue
>   Monthly payment due
>   Where to send your monthly payment

AR 0361.

As Defendants point out, an employee's right to continue coverage for up to twelve

months while on a leave of absence differs from the provisions governing COBRA continuation

coverage. Regarding COBRA continuation coverage, the IBP Plan provides as follows:

> You have the right to elect COBRA continuation coverage if you
> would otherwise lose coverage because of a termination of
> employment (for reasons other than gross misconduct) or a
> reduction in hours of employment.

AR 0136.

Additionally, an employee's right to elect COBRA continuation coverage is triggered by

a "qualifying event." 29 U.S.C.§§ 1161, 1162, 1163. Pursuant to the IBP Plan provisions, the

beginning of an authorized leave of absence does not necessarily constitute a "qualifying event,"

because the employee can continue his coverage for up to twelve months, provided he pays the

premiums. Thus, COBRA continuation coverage only goes into effect for an IBP employee

when the employee actually loses coverage because of a termination of employment or a

reduction in hours of employment.

12

At some point during 2002, Tyson Foods, Inc., acquired IBP, inc., and renamed it Tyson Fresh Meats, Inc. In connection with that acquisition, the IBP Plan terminated on September 30, 2002. Former IBP, inc., employees were allowed to enroll in the Tyson Plan by October 1, 2002, *provided that they were covered employees in the IBP Plan.*[7] AR 0071, 0072, 0258-0260.

Employees were notified that they needed to complete a new enrollment form in order to retain coverage. AR 0071, 0072. In a letter dated September 12, 2002, IBP notified employees on leaves of absence that their benefits would be changing as of October 1, 2002. The letter stated in part: "**You will need to stop by personnel to complete a new enrollment form. This must be done before September 20th.**" AR 0071 (boldface and underlining in original). IBP also sent a letter to team members (presumably employees) dated September 24, 2002, which provided as follows:

> You have already received a packet of information explaining our new benefits plan. You were asked to have this filled out and turned in by September 20, 2002. Since you have not responded this is your second and final notice about the benefits change.
>
> As of October 1, 2002, the current benefits plan will no longer be in effect. ***It is very important that you contact Human Resources so we can make arrangements for you to fill out your enrollment form.***
>
> ***If you do not contact Human Resources by October 1, 2002 you will lose your insurance coverage.***

---

[7] The referenced fact is set forth in the Affidavit of Carolyn Cook, which was submitted by Defendants in response to Plaintiff's discovery requests. Plaintiff apparently does not argue that this "policy" was not actually a "policy" of the Tyson Defendants. Instead, Plaintiff argues that the policy cannot be enforced because "ERISA requires Plans to be in writing." Docket No. 48, *citing* 29 U.S.C. § 1102(a)(1). Additionally, Plaintiff argues that an ERISA Plan's eligibility requirement must be included in the Plan's Summary Plan Description, *citing* 29 U.S.C. § 1022(b). Docket No. 48, p. 11. These arguments will be discussed below.

AR 0072 (boldface, underlining and italics in original).

The copies of the two letters referenced above in the Administrative Record both have Mr. Jordan's name and Social Security number handwritten at the top. Presumably this indicates that Mr. Jordan was sent a copy of these two letters.

On October 4, 2002, Plaintiff came to the Personnel Office to enroll in the Tyson Plan. He crossed out the Walton Ferry Road address and wrote in 107 Camino Circle. He checked a box noting that he wished the "Tyson Premium Medical" coverage, which cost $15 per week. He dated the form October 4, 2002. AR 00352-00353.

As discussed above, Plaintiff began his leave of absence on June 6, 2002. AR 0230. His expected return date, initially, was June 14, 2002. AR 0230. He subsequently extended his leave, however, to June 18, 2002, then to June 24, 2002, then to August 1, 2002, then to September 16, 2002, then to November 9, 2002, and finally to January 6, 2002. AR 0035-0239.

Pursuant to the "coupon booklet" procedure discussed above, the IBP Corporate Benefits Department sent Plaintiff a coupon booklet and an explanatory letter concerning the continuation of his benefits while on leave, on August 9, 2002. AR 0064-0070. The coupon book and letter were sent from the Corporate Benefits Department to Plaintiff at 605 Walton Ferry Road, Hendersonville, Tennessee. Defendant states, "At the time that the coupon book and letter were sent, the HR System that tracked [Plaintiff's] leaves of absence listed [his] address as 605 Walton Ferry Road." AR 00349-00351. It is undisputed that the letter and coupon book sent on August 19, 2002, were returned to the Corporate Benefits Department with the postal service note of "return to sender." AR 0342. The postal service note on the envelope also states:

> Moved left no address
> Unable to forward

14

Return to sender

AR 00342.

Plaintiff, however, points to documents in the Administrative Record that appear to indicate that, as early as January 2002, IBP was sending material to Plaintiff at the Camino Circle address. AR 0031-0032.

In June 2002, Plaintiff had requested short term disability benefits under the IBP Plan. He submitted written notice of his claim to the Claim Administrator for the short term disability benefits, Wellmark Administrators, Inc. When he submitted his notice to Wellmark, he listed 107 Camino Circle as his address.

Plaintiff started receiving short term disability benefits on August 7, 2002. AR 0091. His first check, for $1,105.71, covered a period from June 16, 2002, to August 4, 2002. AR 0091. He received and signed an explanation of disability benefits, which listed the gross benefit he received, the days paid, and any comments from the Administrator. AR 0091. No deductions were made for payment of his insurance benefits. AR 0091.

Plaintiff continued to receive weekly short term disability payments, along with an explanation of benefits, until September 18, 2002. AR 0092-0097. No deductions were made for payment of insurance premiums. *Id.* On September 18, 2002, his explanation of benefits listed his payment of $154.29, which covered the six day time period from September 9, 2002, to September 14, 2002. AR 0097. The comment section stated: "This is your last payment." AR 0097. This "last payment" correlated with Plaintiff's initial expected return to work date of September 16, 2002. AR 0230-0235. At this point, the total number of days for which he had received short term disability pay was 84 days, or 12 weeks. AR 0097.

15

Plaintiff received another short term disability check on October 2, 2002, which covered the time period from September 15, 2002, to September 29, 2002. AR 0098. This new round of benefits lasted for an additional 55 days, or 7 weeks plus 6 days. AR 0098-0104. On November 13, 2002, Plaintiff signed the explanation of benefits that correlated with his last short term disability check. AR 0104. This check covered the period of short term disability from November 4, 2002, to November 8, 2002, and the comment section stated, "This is your last payment." AR 0104. Again, this "last payment" correlated with Plaintiff's leave of absence extension that had initially stated that he would return to work on November 9, 2003. AR 0230-0235.

On November 22, 2002, Plaintiff contacted Travis Fredrickson in the Personnel Department at the Goodlettsville plant to find out why he had not received a short term disability check since November 13, 2002. AR 0105-0106. Mr. Fredrickson spoke with a member of the Corporate Benefits Department in Dakota Dunes, and he learned that when Plaintiff had extended his leave of absence from November 9, 2002, to January 6, 2003, he had not submitted the necessary claim information to extend his short term disability benefits. AR 0105-0107. Thus, the Corporate Benefits Department requested that a manual check be cut to cover Plaintiff's short term disability benefits that had not been paid. AR 0105.

Plaintiff ultimately received a manual check, issued November 30, 2002, for $437.16, which covered the 17 days (November 8 to November 24, 2002) that Plaintiff had not received benefits. AR 0090, 0112. A second check was also issued to Plaintiff on November 30, 2002 (presumably covering the period of time from November 24 to November 30, 2006). AR 0111. This check was issued for the gross amount of $180, but for a net pay of $68.25. Deductions

16

totalling $111.75, including $15 for "PREMS" and $27.81 for "MEDP," had been taken out for insurance premiums. AR 0111. "MEDP" is the acronym for medical premium payments paid under the IBP Plan, and "PREMS" is the acronym for medical premium payments paid under the Tyson Plan. *See* AR 0067-0079, 0039, 0027, 0004. Defendants characterize these deductions as "inadvertent."[8]

Plaintiff received three more short term disability checks on December 7, 2002, December 14, 2002, and December 21, 2002, each equalling $180, the maximum weekly payment. AR 0013, 0015, 0016. None of these three payments had any deduction for insurance premium payments. *Id.*

Plaintiff's short term disability payments ended as of December 21, 2002, because, as of that date, the short term disability benefits had been paid for the maximum benefit period of 26 weeks. AR 0090.

As discussed above, Plaintiff's last extension of his leave of absence ended January 6, 2003. When he did not return to work by January 21, 2003, he was sent a letter at the Camino Circle address. According to Defendant, the letter was from Gary Denton. It is unclear exactly who Mr. Denton is, except that the letter is on "IBP" letterhead. The salutation and body of the letter state as follows:

> Dear Mr. Jordan
>
> Our records indicate that your leave of absence expired on 01-06-2003, and you were expected to either return to work on this

---

[8] The deductions for medical premium payments total $42.81. The total deductions from the check, however, were $111.75. Insofar as the undersigned can determine, neither party makes any argument with regard to these "other" deductions from that pay check, *i.e.*, $111.75 minus $42.81, which total $69.84.

17

day or provide medical documentation extending your medical leave. We have received no such documentation from you, and we have not had any further communication from you regarding your employment status. Since you have failed to provide medical documentation to extend your leave you are currently on an unauthorized medical leave of absence.

It is critical that you provide medical documentation which states the necessity for you to remain on medical leave by Friday 1-24-03. Please come to my office so that we may discuss your employment within company policy. If you fail to do so, I will assume you are not interested in maintaining your employment with IBP, and you will be removed from the payroll.

AR 0010.

By February 10, 2003, Plaintiff still had not communicated with Mr. Denton regarding his employment status.[9] Thus, Mr. Denton sent Plaintiff a second letter at the Camino Circle address, which stated in pertinent part as follows:

As I indicated to you in my letter of January 21st, 2003 it was necessary for you to meet with me to discuss your leave of absence, and the possibility of extending that leave should you provide additional medical documentation.

Since you made no attempt to contact me, I can only assume that you are not interested in maintaining your employment at the IBP facility in Goodlettsville, Tn., and you have been removed from the payroll effective January 31, 2003.

Please call me if you believe this is an error and you wish to remain on the payroll. You can contact me directly at 855-2749.

Plaintiff never contacted Mr. Denton to discuss his employment status.[10] Thus, his

---

[9] There is nothing specific in the record to support this fact. Again, however, Plaintiff does not take issue with it.

[10] There is nothing specific in the record to support this fact. Again, however, Plaintiff does not take issue with it.

employment was terminated effective January 31, 2003. AR 00225. The "Separation Notification Form" for Plaintiff listed "Voluntary Resignation" as the "Reason for Action."

As discussed above, Plaintiff's Amended Complaint avers that, after he learned that he was without health care coverage in December 2002, "he protested that fact and attempted to be reinstated (or enrolled as Defendants would have it) in the Tyson Plan." Docket No. 22, p. 6. There is nothing in the record, however, to indicate that Plaintiff ever contacted Mr. Denton in response to these two letters.

The record does indicate that Plaintiff's then-attorney, Mr. Yezbak, sent a letter dated December 10, 2002, to Travis Fredrickson at IBP, inc. (AR 0001) and an identical letter to Paul Kirchner at IBP, inc. (AR 0002). The letter states in part that Plaintiff had been informed that he had no health insurance coverage. The letter states that Plaintiff informed the attorney that he had "tried to get this situation resolved by speaking with you several times." The letter stated, "[Plaintiff] has never been asked to pay any health insurance premiums and was never notified by IBP that he needed to take any actions in order to preserve his health insurance benefits." *Id*. The letter further asks that Plaintiff's coverage be "reinstated today." *Id.*

On January 7, 2003, Mr. Kirchner wrote Mr. Yezbak and provided an explanation of how Plaintiff's coverage could be reinstated. AR 0003-0004. That letter stated in pertinent part as follows:

> [Plaintiff] received a short-term disability check in November [2002], and the following deductions were taken in error as part of that check: $15.00 (1 week) for the 10-02 Plan and $27.81 (3 weeks at $9.27/week) under the old Plan. The latter deduction was applied to three-fourths of the July premium, the most recent arrearage. Consequently, a portion of July's premium was left unpaid along with all of the premiums for August and September. This leaves your client with no medical coverage for part of July,

19

and all of August and September, under the Group Medical Plan for IBP, unless he pays the arrearage of $80.37 in full.

As of October 1, 2002, the company completed its merger of the Group Medical Plan Coverage for the entire company. That Plan provides that team members on a leave of absence with your client's seniority are allowed to make continuation payments for three months [allowing credit for the one week deduction from the short-term disability check] ($180), and if these payments are made, then the team member will receive a COBRA notice at the end of the three month period. Since Mr. Jordan is in arrears for a substantial portion of October and all of November and December, he should pay for that time period as well so that has no break in coverage. The total payment needed to maintain his coverage without interruption would be $260.37. Otherwise, upon return to work, Mr. Jordan will be able to participate in the Medical Benefit Plan upon payment of his premiums with a break in coverage for any period of unpaid premiums.

*Id.*

On January 15, 2003, Mr. Kirchner again wrote Mr. Yezbak, stating in part:

Once again, please advise [Plaintiff] of my January 7th correspondence as soon as possible so that he may decide whether to pay his arrearages and obtain his medical benefits without further interruption to his coverage. He may also contact Mr. Denton to make the appropriate payment.

AR 0008.

Both these letters were written while Plaintiff was still an employee of Defendants, and while it seemed that Plaintiff might return to work.

On February 21, 2003, Mr. Yezbak wrote to Mr. Kirchner, formally requesting certain Plan documents under ERISA, and formally appealing Tyson's alleged denial of Plaintiff's medical and disability benefits. AR 0015-0017.

As discussed above, Plaintiff's employment was terminated on January 31, 2003. On March 21, 2003, Plaintiff's then-attorney wrote to Mr. Kirchner, stating in part as follows:

20

> Be advised that [Plaintiff] is hereby making his COBRA election to continue his benefits. I understand from your previous communication that IBP was taking the position that Mr. Jordan needed to pay IBP additional premium payments before he is eligible for COBRA benefits. As previously discussed we disagree with this position, in order to facilitate needed medical treatment for [Plaintiff], he is prepared to pay the amounts IBP claims are owed. These payments will be under protest with a reservation of all rights to Mr. Jordan.
>
> Please fax me a statement of what IBP claims Mr. Jordan must pay in order to have his current benefits under COBRA immediately. It is unfortunate the way IBP is handling this situation. Unfortunately, Mr. Jordan has no choice but to pay, under protest and with a reservation of all rights, the money you claims [sic] he is owed [sic] so that he can obtain medical treatment. Therefore, once I receive this statement, I will forward you a check.

AR 0018.

Insofar as the record shows, however, neither Plaintiff nor his attorney ever paid the arrearages in order to reinstate and/or continue his coverage.

Upon electing COBRA continuation coverage on March 21, 2003, Plaintiff had 45 days to make his first premium payment. 29 U.S.C. § 1162. He never made such a payment.[11] Plaintiff never even attempted to make his first (or any subsequent) COBRA premium payment.[12]

On April 15, 2003, Lois Bottomley, Plan Administrator for the Tyson Plan, responded to Plaintiff's counsel's February 21, 2003, letter. AR 0025-0027. Ms. Bottomley explained that,

---

[11] There is nothing specific in the record to support this fact. Again, however, Plaintiff does not take issue with it.

[12] There is nothing specific in the record to support this fact. Again, however, Plaintiff does not take issue with it.

21

based on the Administrative Record, Plaintiff had received disability benefits for the maximum 26-week period in connection with his most recent period of alleged disability. AR 0026. In response to Plaintiff's claim for COBRA health continuation coverage, Ms. Bottomley explained that Plaintiff did not notify IBP, inc., his employer at the time he went on a leave of absence, of a change of address in a timely manner and that he did not make a timely election of COBRA health continuation coverage. AR 0026. Ms. Bottomley also offered to pay the "inadvertent" deductions of $42.81 from Plaintiff's short term disability check issued November 30, 2002, discussed above. AR 0027. (This amount was comprised of a $15 deduction for 1 week of insurance premiums under the Tyson Plan, and a $27.81 deduction for 3 weeks of insurance coverage under the IBP Plan. *See* AR 004.)

On June 3, 2003, Plaintiff appealed the Plan Administrator's decision, through his new and current counsel, Mr. Skeie.

From August 15, 2003, through January 11, 2005, counsel for the parties engaged in discussions about reinstating Plaintiff's coverage. AR 0037-0056. On September 18, 2003, Tyson offered to treat Plaintiff as a continuing COBRA participant effective August 6, 2002, up to the maximum health continuation coverage period provided by COBRA, in exchange for Plaintiff's paying back premiums for COBRA coverage through September 30, 2003, and executing a release in favor of Tyson Foods and its affiliates. AR 0043-0046.

At this stage of the negotiations, Tyson was treating the August 2 letter and coupon book sent to Jordan as a COBRA notification. Tyson later revised its decision regarding the August 2 letter and offered October 1, 2002, as the start date for the 18-month COBRA continuation coverage. AR 0057-0058. Thus, Tyson was extending the amount of coverage Jordan could

actually receive; instead of having to pay coverage for 18 months beginning in August 2002,

Plaintiff was given free coverage from August 2002 to September 30, 2002, then given the

opportunity to elect coverage for an 18-month period starting October 1, 2002.

On October 1, 2003, Plaintiff's current counsel rejected Tyson's offer, stating in part:

> The potential impact of the terms of this agreement on Mr.
> Jordan's various causes of action now pending or that might be
> brought is too severe and sweeping for me to recommend it to him.
> Although I am confident that you and your firm would not seek to
> expand the agreement beyond your oral explanations of the
> provisions, I cannot expose Mr. Jordan to the alternative
> interpretations that could be asserted after it is entered and your
> firm is no longer involved in the matter.
>
> If your client is willing to enter an agreement that precludes Mr.
> Jordan from asserting a claim under ERISA without additional
> clauses and provisions that might affect his ability to prosecute his
> non-ERISA causes of action, then we should be able to draft a
> short, simple agreement. If a very simple, limited agreement is not
> acceptable to your client, then it should resume the administrative
> appeal process for [Plaintiff's] claim.[13]

AR 0047 (footnote added).

Thereafter, Tyson amended the Settlement Agreement to remove the provisions waiving

Plaintiff's right to bring any other claims against Tyson. AR 0048-0052. The release provisions

of that proposal applied only to Plaintiff's claims under ERISA. AR 0049.

Insofar as the record shows, Mr. Skeie never responded to this revised Agreement.

Fifteen months later, on January 11, 2005, Plaintiff's counsel requested a final

determination of Plaintiff's appeal. AR 0056. Thereafter, on April 28, 2005, Rick Arenburg,

---

[13] It should be noted that Plaintiff filed a separate lawsuit approximately two weeks later against Tyson Fresh Meats, Inc., alleging violations of the ADA. *Jason Jordan v. Tyson Fresh Meats, Inc.,* Case No. 3:03-00966, United States District Court for the Middle District of Tennessee.

23

Case 3:05-cv-00513   Document 69   Filed 11/02/06   Page 23 of 43 PageID #: 464

acting as Plan Administrator on behalf of Tyson, issued the final determination. AR 0057-0058. Without conceding that Tyson had failed in its obligations to provide Plaintiff his COBRA notice, Mr. Arenburg offered Plaintiff the opportunity to elect COBRA continuation coverage for the 18-month period between October 2002 and March 2004. AR 0057. Plaintiff could elect COBRA continuation coverage and pay $201.77 per month for a total cost of $3,631.86. AR 0058.

The April 28, 2005, letter also served as Plaintiff's formal COBRA notification letter. Pursuant to his notification, Plaintiff had sixty (60) days from the receipt of the notification to elect COBRA coverage, and forty-five (45) days after election to make his first premium payment. AR 0058. Plaintiff did not elect COBRA continuation coverage, nor did he pay any premiums.[14]

On April 29, 2005, Plaintiff's counsel rejected Tyson's final offer, stating:

> I regret to inform you that your letter does not comport with my understanding of the facts related to Mr. Jordan's eligibility for benefits under the Tyson Foods, Inc., Group Health Plan. Your letter presumes that Mr. Jordan's employment terminated on or before October 1, 2002. I believe that that presumption is in error. My understanding is that Mr. Jordan was terminated from employment on January 31, 2003. This discrepancy has a significant impact on Mr. Jordan because of the financial cost of COBRA coverage vs. coverage under the Plan as an employee.

AR 0059.

Defendant argues that this letter also shows that Plaintiff's counsel had a clear understanding of which premium payments he should pay in order to reinstate his health care

---

[14] There is nothing specific in the record to support this fact. Again, however, Plaintiff does not take issue with it.

coverage.

Mr. Arenburg responded that the April 28, 2005, letter constituted a favorable action for Plaintiff, and that Plaintiff could have initiated a new claim if he disputed the start date for COBRA continuation coverage. AR 0061. The initiation of a new claim, however, would not delay or extend the 60-day or 45-day deadlines for electing and paying for COBRA continuation coverage. AR 0062. Again, Plaintiff did not elect COBRA continuation coverage or pay any premiums within the applicable time periods.[15] Instead, on June 27, 2005, Plaintiff filed the instant lawsuit.

### III.  Discussion

### A.  Introduction

As discussed above, Plaintiff's theories have changed throughout the course of this litigation. In addressing the instant Motion that has been filed by Plaintiff and that has been referred to the undersigned, the undersigned will consider only the arguments raised in Plaintiff's Motion, and only those arguments to the extent that they were raised in his Amended Complaint. The Court has no obligation to attempt to follow Plaintiff's changing theories and to try to determine which of them he is attempting to assert, nor to attempt to discern whether Plaintiff might have other remedies that he has not sought.

Focusing on Plaintiff's Motion for Judgment on the Administrative Record, Plaintiff essentially seeks four categories of relief: (1) statutory and remedial relief for Defendants' ongoing failure to provide Plaintiff with a timely COBRA notice, pursuant to 29 U.S.C. §

---

[15]  There is nothing specific in the record to support this fact. Again, however, Plaintiff does not take issue with it.

1132(c)(1)(A); (2) statutory and remedial relief, pursuant to 29 U.S.C. § 1109(a), "for wrongfully withholding and retaining premiums from Plaintiff's short-term disability benefits," as well as the return of $427.17 that Defendants "improperly withheld" from Plaintiff; (3) a remand to the Administrator, pursuant to 29 U.S.C.§ 1132(a)(1)(B), "to determine and resolve all unpaid benefits payable under either Plan through January 31, 2003"; and (4) an order, pursuant to 29 U.S.C. § 1132(a)(1)(B) "instructing Defendants to give a COBRA-Complaint notice to Plaintiff of his right to elect continuation coverage beginning February 1, 2003."

It can readily be seen that this is not a typical ERISA "denial of benefits" case. Nonetheless, Defendants concede that the IBP Plan did not include a specific reservation of authority to the Plan Administrator, and the parties agree that the decision to deny Plaintiff coverage under the IBP Plan is subject to *de novo* review by this Court. Docket No. 38, p. 3 and Docket No. 47, p. 25. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 613 (6th Cir. 1998).

The parties disagree, however, as to the standard of review for decisions made regarding the Tyson Plan. Defendants point out that the Tyson Plan specifically grants discretionary authority to the Plan Administrator and argue, therefore, that the Court should apply an arbitrary and capricious standard of review. Docket No. .47, p. 25. Plaintiff admits that the Tyson Plan does grant discretionary authority to the Plan Administrator, but he argues:

> Defendants did not include a copy of the Tyson Plan in the Administrative Record. . . . They only filed a copy of the Tyson Plan with this Court after they were compelled to do so. . . . Therefore the reservation of discretionary authority clause in the Tyson Plan is ineffective in this case because it was not referred to or relied upon by the Defendants in their administrative review of this case.

As will be discussed in greater detail below, however, the Court need not consider any provisions of the Tyson Plan.[16]

## B.  ERISA Issues

### 1.  Plaintiff's Request for a Remand

Plaintiff's request for a remand, for the purpose of determining and resolving unpaid benefits payable, is filed pursuant to 29 U.S.C. § 1132(a)(1)(B), which provides as follows:

>    (a) **Persons empowered to bring a civil action.**  A civil action may be brought –
>
>    (1) By a participant or beneficiary –
>
>    . . .
>
>       (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .

Plaintiff cites no authority for the proposition that this case should be remanded to the Administrator for the calculation of anything.  Moreover, Plaintiff's request for relief assumes that there are "unpaid benefits payable under either Plan . . . ."  The Court disagrees, however, for the following reasons.

First, the terms of the IBP Plan plainly provide that, if an employee on leave does not pay for his insurance, he will lose it.  Plaintiff is charged with knowing the terms of the Plan.  *See Aguilera v. Landmark Hotel-Metairie*, 1992 U.S. Dist. LEXIS 19720, *9 (E.D. La.)

---

[16]  Even so, the Court observes that Plaintiff cites absolutely no authority for his argument.  The Court further notes that the statement, "They only filed a copy of the Tyson Plan with this Court after they were compelled to do so," is simply false.  This Court never compelled Defendants to file the Tyson Plan with the Court.  The Order cited by Plaintiff in support of that statement is an Order granting Plaintiff's Motion to Conduct Discovery.  Docket No. 24.

("Furthermore, Plaintiff cannot plead ignorance to the policies of her own health care program, since it was her responsibility to make sure she was following its requirements."). Under these circumstances, the parties' detailed arguments concerning the fact that Plaintiff did not receive a coupon book and the issue whether Defendants knew of, did not know of, or simply ignored, Plaintiff's change of address are completely irrelevant. The purpose of the coupon booklet was merely to help an employee on leave "remember" to send in his insurance premiums. The coupons did not give Plaintiff any rights that he did not otherwise have, nor did they remove any obligations that he otherwise had. Simply stated, Plaintiff must have known from the Plan document itself that if he did not pay his insurance premiums while on leave, he would lose his insurance coverage.

It is undisputed that Plaintiff did not pay his insurance premiums while he was on leave. Plaintiff argues that Defendants withheld monies from Plaintiff's short-term disability checks for the payment of those premiums. The withholding, however, occurred only once, out of 15 disability checks, and Defendants withheld a total of $42.81, only $27.81 of which was for IBP Plan premiums. The IBP Plan itself states, "If you fail to pay any required contribution [to continue insurance coverage], coverage will terminate on the last day of the period for which contributions were paid." By the IBP Plan's own terms, Plaintiff's benefits terminated in July or August 2002, at the very latest.

Plaintiff intimates that he should have been given notice of the termination of his benefits. Plaintiff cites no authority, however, for this proposition. As discussed above, Plaintiff is charged with knowing the provisions of the Plan. Moreover, any reasonable person surely would have known that he was not entitled to free insurance benefits. Admittedly, Defendants

28

should have realized much earlier than November that Plaintiff had not paid any health insurance premiums since June. The fact that they did not do so, however, inured solely to Plaintiff's benefit and, because of Defendants' errors, Plaintiff actually received essentially free health care benefits until approximately December 2002.

Because Plaintiff's benefits under the IBP Plan had terminated in July or August 2002, Plaintiff was not eligible for coverage under the Tyson Plan, pursuant to a policy instituted by Tyson. As discussed above, Plaintiff does not take issue with the existence of the policy. Instead, Plaintiff argues that the policy should have been written into the Tyson Plan. Plaintiff, however, cannot complain about the provisions of the Tyson Plan, nor can Plaintiff sue for any benefits under the Tyson Plan, since Plaintiff was never a beneficiary or a participant in the Tyson Plan.

As discussed above, 29 U.S.C. § 1132(a)(1)(B) provides that a civil action may be brought by "a participant or beneficiary." For purposes of ERISA, "the term 'beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(a). Plaintiff is not a "beneficiary" under the Tyson Plan.

The term "participant," for purposes of ERISA, is defined in 29 U.S.C. § 1002(7) as follows:

> The term "participant" means any employee or former employee of an employer or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

In *Firestone Tire & Rubber Co. v. Bruch*, 49 U.S. 101 (1989) the Court further refined

29

the definition of "participant" as follows:

> In our view, the term "participant" is naturally read to mean either "employees in, or reasonably expected to be in, currently covered employment, . . . or former employees who "have . . . a reasonable expectation of returning to covered employment" or who have "a colorable claim" to vested benefits. . . .

> In order to establish that he or she "may become eligible" for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future. "This view attributes conventional meanings to the statutory language since all employees in covered employment and former employees with a colorable claim to vested benefits 'may become eligible.' A former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits, however, simply does not fit within the [phrase] 'may become eligible.'"

489 U.S. at 117-18 (citations omitted).

Plaintiff was not in, or reasonably expected to be in, currently *covered* employment, at least with Tyson. He was not a "former employee" who had "a reasonable expectation of returning to covered employment"; instead, Plaintiff was an employee who was on a leave of absence. Finally, Plaintiff has no colorable claim that he will prevail in the suit for benefits or that eligibility requirements will be fulfilled in the future. Thus, Plaintiff is not a "participant" in the Tyson Plan, and he cannot make claims against the Tyson Plan under 29 U.S.C. § 1132(a)(1)(B).

Even if Plaintiff could raise the argument that the policy was not written in the Tyson Plan, Plaintiff relies on 29 U.S.C. § 1102(a)(1) for the proposition that "ERISA requires Plans to be articulated in a written instrument . . . ." Docket No. 38, p. 6. The statute cited by Plaintiff provides as follows:

**Establishment of Plan**

30

> **(a) Named fiduciaries.** (1) Every employee benefit plan shall be
> established and maintained pursuant to a written instrument. Such
> instrument shall provide for one or more named fiduciaries who
> jointly or severely shall have authority to control and manage the
> operation and administration of the plan.

29 U.S.C. § 1102(a)(1).

Plaintiff fails to mention, however, the provisions of § 1102(b), which provide as

follows:

> **(b) Requisite features of plan.** Every employee benefit plan
> shall –
>
> (1) provide a procedure for establishing and carrying out a funding
> policy and method consistent with the objectives of the plan and
> the requirements of this title,
>
> (2) describe any procedure under the plan for the allocation of
> responsibilities for the operation and administration of the plan
> (including any procedure described in section 405(c)(1) [29 U.S.C.
> § 1105(c)(1), which is not applicable here]
>
> (3) provide a procedure for amending such plan and for identifying
> the persons who have authority to amend the plan, and
>
> (4) specify the basis on which payments are to be made to and
> from the plan.

Section 1102(a)(1), upon which Plaintiff relies, provides that an "employee benefit plan"

must be established and maintained pursuant to a written instrument. It says nothing about the

kind of policy at issue here, and the kind of policy at issue here is not a "requisite feature" of the

Tyson Employee Benefit Plan such that it would have to be in writing.

Moreover, there is another reason why Plaintiff is not entitled to benefits under either

Plan. When Plaintiff "discovered" in December 2002 that he had no longer had coverage, he

avers that, "he protested that fact and attempted to be reinstated (or enrolled as Defendants

31

would have it) in the Tyson Plan." Docket No. 22, p. 6. He further avers that Defendants (presumably Tyson and/or the Tyson Plan) "refused Plaintiff's request to be reinstated (or enrolled) in the Tyson Plan." *Id.* Plaintiff's statement, however, is contradicted by the record.

As discussed above, the record contains correspondence showing that Defendants offered Plaintiff at least 3 chances to continue his coverage under the IBP Plan, and to obtain coverage under the Tyson Plan, by paying the unpaid premiums. For whatever reason, he never did so.

In view of the above facts, and reviewing the Administrative Record *de novo*, the Court concludes that Defendants' decision to deny Plaintiff coverage under the IBP Plan and later the Tyson Plan was correct. Thus, Plaintiff's claim under 29 U.S.C. § 1132(a)(1)(B) fails.

## 2. Plaintiff's Request for Relief Under 29 U.S.C. § 1109(a)

In the instant Motion, Plaintiff seeks statutory and remedial relief in the amount of $88,400.00, allegedly pursuant to 29 U.S.C. § 1109(a), "for wrongfully withholding and retaining premiums from Plaintiff's short-term disability benefits, and instructing them to return Plaintiff the $427.17 they improperly withheld from him."

Section 1109(a) provides as follows:

**Liability for breach of fiduciary duty**

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary, and shall be subject to other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 411 of this Act.

The plain language of this section restricts its application to cases involving only

32

breaches of duty to *the Plan*, and the statute gives a remedy only to the Plan itself. In

*Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 140 (1985), the Court stated:

> There can be no disagreement with the Court of Appeals'
> conclusion that § 502(a)(2) [29 U.S.C. § 1132(a)(2)] authorizes a
> beneficiary to bring an action against a fiduciary who has violated
> section 409. Petitioner contends, however, that recovery for a
> violation of § 409 inures to the benefit of the Plan as a whole. We
> find this contention supported by the text of § 409 [29 U.S.C. §
> 1109], by the statutory provisions defining the duties of a
> fiduciary, and by the provisions defining the rights of a
> beneficiary.

In the case at bar, Plaintiff has no claim under § 1109(a), based upon an allegation that

Defendants improperly withheld money from his short term disability check. Plaintiff does not

aver that that action caused "any losses to the Plan," nor does Plaintiff seek "to restore to such

Plan any profits of such fiduciary . . . ."

Plaintiff further argues that § 1109(a) provides that a fiduciary "who breaches any of the

responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be . . .

subject to such other equitable or remedial relief as the court may deem appropriate." Docket

No. 38, p. 20. The Supreme Court in *Russell*, however, specifically rejected the proposition that

the referenced language ("such other equitable or remedial relief as the court may deem

appropriate") provided an individual a cause of action for extra-contractual damages. 473 U.S.

at 148.

Thus, Plaintiff has no claim under § 1109(a).

The Court notes that there appears to be some discrepancy as to the amount that was

withheld, and perhaps some discrepancy as to how many checks were subject to withholding.

Plaintiff states, "Between October 1 and November 30, 2002, Defendants withheld a total of

33

$667.43 from Plaintiff's disability benefits." Docket No. 38, p. 13. Plaintiff cites AR 0111 for this proposition, but the amount of $677.43 does not appear anywhere on AR 0111, and, insofar as the Court can determine, nothing on AR 0111 supports that statement. Plaintiff then argues that, of this amount, "it would appear that $250.26 was withheld as premiums for medical insurance." *Id., citing* AR 0111.[17] Plaintiff's Motion, however, seeks to recover the specific amount of $427.17. Docket No. 37, p. 1.

On the other hand, Defendants argue that the only deductions for health insurance benefits were $15 for medical premiums under the Tyson Plan and $27.81 for medical premiums under the IBP Plan. These deductions were taken from one check issued November 30, 2002. Docket No. 47, p. 16.

As discussed above, however, the amount sought is irrelevant, because Plaintiff has no claim for such reimbursement pursuant to § 1109(a).

Furthermore, Defendant offered Plaintiff a credit for at least some of the deductions at issue. AR 003-004. When Plaintiff refused to pay the remaining premiums to reinstate his coverage, Tyson again offered to reimburse him for the amount deducted. AR 0025-0027. In a letter dated April 15, 2003, from Lois Bottomley to Mr. Yezbak, Tyson stated:

> We recognize that, after the expiration of the COBRA election
> period, IBP, inc.'s payroll department inadvertently deducted

---

[17] The referenced document is headed "Human Resource System Employee Information for 11/30/2002," and it bears Plaintiff's name. On that document, the figure $250.26 appears as a YTD (presumably Year to Date) figure for "MEDP." As has been previously discussed, "MEDP" refers to deductions for health benefits for the IBP Plan. Plaintiff had actually worked part of the year 2002 for IBP, and, presumably, the figure $250.26 contains insurance premiums that were deducted from Plaintiff's IBP checks while he was working. Thus, that figure says nothing about amounts that were withheld as premiums while Plaintiff was on his leave of absence.

> amounts from Mr. Jordan's November disability payments in the
> total amount of $42.81. A check refunding the mistaken
> deductions will be made payable to Mr. Jordan and delivered to
> you by a separate correspondence.

AR 0027.

It is evident from Plaintiff's argument discussed above that he is seeking equitable relief under § 1109(a). In view of the fact that Defendants offered to repay the amount deducted for Plaintiff's health insurance benefits, equitable relief is not appropriate. Plaintiff simply cannot reject Defendants' offers to reimburse him and then claim "statutory damages" in the amount of $88,400.00. Additionally, Plaintiff cites no authority for the proposition that statutory damages may be recovered under Section 1109(a), even if he could state a claim under that Section.

### C. COBRA Issues

Plaintiff's Motion seeks two elements of relief with regard to his COBRA claims:

> Plaintiff asks for an Order pursuant to 29 U.S.C. § 1132(c)(1)(A)
> instructing Defendants to pay statutory and remedial relief in the
> amount of $95,700 for their ongoing failure to provide Plaintiff
> with a timely COBRA notice.
>
> . . .
>
> Plaintiff asks for an Order pursuant to 29 U.S.C. § 1132(a)(1)(B)
> instructing Defendants to give a COBRA-compliant notice to
> Plaintiff of his right to elect continuation coverage beginning
> February 1, 2003.

Docket No. 37, p. 1-2.

Initially, the Court notes that COBRA continuation coverage is governed by 29 U.S.C. §§ 1162-1166. Plaintiff cites no authority for the proposition that he can recover for violations of the COBRA statutes through an ERISA action pursuant to 29 U.S.C. § 1132(a)(1)(B).

Section 1132(c)(1)(A) does provide that an Administrator who fails to meet the COBRA

35

notice requirements of 29 U.S.C. § 1166(a)(4) "may in the court's discretion be personally liable to such participant or beneficiary in the amount of $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."

Plaintiff apparently recognizes that the standard of review which this Court should apply to the COBRA issues is not the same standard of review that the Court would apply to the ERISA issues. Plaintiff states:

> Plaintiff has consistently maintained that he did not receive a timely COBRA notice, therefore Defendants have the burden of proof to show that they complied with COBRA. (Citing cases.)

Docket No. 38, p. 4.

Defendants argue, however that their COBRA obligations should be reviewed under a "good faith" standard. Docket No. 47, p. 27. Defendants argue that they made a good faith effort to comply with COBRA. *Id.*

The Court need not determine exactly which standards govern Plaintiff's COBRA claims, because the Court concludes that, under any applicable standard, Plaintiff has failed to state a prima facie case for a COBRA-notice violation claims.

Plaintiff explains his view of COBRA as follows:

> Congress enacted COBRA to protect individuals from becoming suddenly uninsured after losing coverage under an employer's medical insurance plan. Generally, COBRA requires employers to permit covered individuals who lose coverage due to a "qualifying event" to elect to continue their coverage on a self-pay basis for 18 or 36 months. . . .
>
> . . .
>
> Congress wrote two very specific notification requirements into COBRA to insure that employees would receive timely information regarding their COBRA continuation rights. The first

36

notice required under COBRA occurs when coverage begins. 29 U.S.C. § 1166 (a)(1). The second COBRA [*sic*] is triggered by a "qualifying event." One such event is the covered employee's loss of coverage due to a reduction in hours or termination of employment. 29 U.S.C. § 1163(2). When an employee loses coverage due to termination or a reduction in hours the employer must notify the Plan Administrator of that fact within 30 days of a covered employee's loss of benefits. 29 U.S.C. § 1166(a)(2). The Administrator then has fourteen days to notify the qualified beneficiary of his right to continue coverage. 29 U.S.C. § 1166(a)(4). A qualified COBRA beneficiary then has 60 days to elect to continue coverage, 29 U.S.C. § 1165(a)(1), and at least 45 days after electing continuation coverage to make his first premium payment. 29 U.S.C. § 1162(3).

Docket No. 38, p. 2-3.

Plaintiff argues that Defendants have taken varying and inconsistent positions with regard to Plaintiff's COBRA notice. Docket No. 45, p. 6-7. While Plaintiff is correct with regard to Defendants' inconsistent positions, the Court concludes that these arguments are simply a red herring.

As Plaintiff himself recognizes, the obligation of an employer to provide a COBRA continuation notice to an employee is triggered by a "qualifying event." But Plaintiff never specifies in his Memorandum exactly what his "qualifying event" was.

29 U.S.C. § 1163 provides in pertinent part as follows:

**Qualifying event.**
For purposes of this part [29 U.S.C. §§ 1161 *et seq.*], the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part [29 U.S.C. §§ 1161 *et seq.*], would result in the loss of coverage of a qualified beneficiary;

(1) the death of the covered employee.
(2) the termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

37

> (3) the divorce or legal separation of the covered employee from the employee's spouse.
> (4) the covered employee becoming entitled to benefits under Title XVII of the Social Security Act.
> (5) a dependent child ceasing to be a dependent child under the generally applicable requirements of the Plan.
> (6) a proceeding in a case under Title 11, United States Code, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time.

In his Amended Complaint, Plaintiff averred that the "qualifying event" giving rise to a requirement of COBRA notice was either Plaintiff's termination from the Tyson Plan, or Plaintiff's termination from the IBP Plan. Docket No. 22, p. 5, ¶¶ 35, 38. It can readily be seen, however, that an employee's termination from an ERISA benefits plan is not a "qualifying event" for COBRA purposes under either Section 1163 or the terms of the IBP Plan.

Plaintiff apparently implies, without specifically arguing, that the "qualifying event" in this case was either a reduction in hours or a termination of employment. But, Plaintiff did not lose his coverage under the IBP Plan because of a reduction in hours or a termination of employment. He lost his coverage because he failed to pay his premiums. A lapse in coverage because of an employee's failure to pay premiums is not a "qualifying event" under COBRA. *See Aquilera v. Landmark Hotel-Metairie,* 1992 U.S. Dist. LEXIS 19720.

Plaintiff cannot argue that taking a leave of absence constituted a "reduction in hours" sufficient to be a qualifying event, because § 1163 provides in pertinent part:

> the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part would result in the loss of coverage of a qualified beneficiary . . . .

38

Plaintiff's going on a leave of absence did not "result in the loss of coverage of a qualified beneficiary," and, therefore, could not have been a "qualifying event" under COBRA.

Moreover, it seems clear that when an employee loses coverage because of an event that does not meet the definition of a "qualifying event," that employee is no longer a "covered employee." Employees who are not "covered employees" have no rights to COBRA notification.

As discussed above, Plaintiff was never covered under the Tyson Plan. Thus, he was never entitled to COBRA notification under that Plan, even when his employment was ultimately terminated.

Upon Plaintiff's Motion, the Court allowed Plaintiff to conduct limited discovery in this case. Plaintiff sent a set of Interrogatories to Defendants asking, in part, that Defendants identify Plaintiff's "COBRA-qualifying event" and when it occurred. AR 0363. Defendants responded that Plaintiff's "COBRA-qualifying event occurred when it was discovered that [Plaintiff's] coverage under the IBP Welfare Benefits Plan had lapsed due to [Plaintiff's] failure to pay premiums during a medical leave of absence." *Id.* They further identified that date as November 26, 2002.

In their Response to Plaintiff's Motion for Judgment on the Administrative Record, Defendants now argue that the termination of Plaintiff's health insurance coverage did not trigger COBRA notice requirements, because it was not a "qualifying event." Docket No. 47, p. 31.

In his Reply, Plaintiff addressed these arguments as follows:

> Defendants argue that their termination of Jordan's health
> insurance did not constitute a qualifying event. . . . One problem

39

with this argument is that Defendants have already identified November 26, 2002, as the date of Jordan's qualifying event. . . . Prior to answering Plaintiff's Interrogatories, Defendants identified October 1, 2002, as the date of Jordan's qualifying event. . . . Prior to that Defendants identified August 6, 2002, as the date of Jordan's qualifying event. . . . More importantly, Defendants' claim that the termination of Jordan's medical insurance was not a qualifying event is incompatible with COBRA's definition of a qualifying event. 29 U.S.C. § 1163(2).

Docket No. 48, p. 6-7.

As discussed above, however, the termination of Plaintiff's medical insurance was not a qualifying event under § 1163(2). For this reason, the Court does not deem it inappropriate for Defendants to make the argument that no qualifying event ever occurred, despite the Interrogatory Response referred to above.

For the foregoing reasons, Plaintiff was not entitled to COBRA notification from Defendants.

The Court further notes that, as late as April 2005, Defendants were offering Plaintiff the opportunity to pay his premiums and resume his coverage, at the lower Plan rate, not the higher COBRA rate.[18] As Defendants argue, COBRA notice was not necessary at that point, because Plaintiff had the opportunity to continue coverage at the lower Plan rate, not the COBRA rate.

Moreover, as discussed above, on March 21, 2003, Mr. Yezbak wrote to Mr. Kirchner stating in part, "Be advised that Mr. Jordan is hereby making his COBRA election to continue

---

[18] The premium rates under the IBP Plan and the Tyson Plan were much less expensive than the COBRA rates. The premium payment under the Tyson Plan for medical benefits was $15 per week, or approximately $60 per month. The premiums under the IBP Plan were $9.27 per week or approximately $37.08 per month. COBRA rates for the same period under the IBP Plan were $156.99 per month, and under the Tyson Plan were $202.77 per month. Docket No. 47, p. 18.

his benefits." AR 0018. Thus, even though Plaintiff argues that he never received a COBRA compliant notice, he nonetheless made a COBRA election on March 21, 2003.

After electing COBRA continuation coverage, an employee must pay his premiums within 45 days of election. 29 U.S.C. § 1163(3). If he does not pay them, his right to COBRA continuation coverage terminates. 29 U.S.C. § 1162(2)(C). Thus, as of May 15, 2003, Plaintiff was no longer entitled to COBRA continuation coverage, because he had elected it but never paid for it.[19]

Additionally, in September 2003, Tyson offered "to establish Mr. Jordan as a COBRA participant in the Tyson Foods, Inc., Group Health Plan effective August 6, 2002, and treat him as a continuing COBRA participant for up to the maximum 18-month health continuation coverage period permitted by the COBRA laws." AR 0043. Plaintiff did not accept that offer. Tyson then presented a revised Settlement Agreement, again proposing in part, "Tyson will cause the Plan to recognize Jordan as a "COBRA" participant in the Plan effective August 6, 2002, with a maximum health continuation coverage period of up to eighteen (18) months thereafter
. . . ." AR 0049. Again, Plaintiff's counsel did not respond to that proposal.

Furthermore, on April 28, 2005, Defendants' counsel sent a letter to Plaintiff's counsel stating in part as follows:

> Consequently, by this correspondence, the Company [Tyson Foods, Inc.] is now providing Mr. Jordan with the opportunity to elect COBRA continuation coverage for up to the maximum COBRA continuation period – from October 2000 through March

---

[19] There is nothing specific in the record to support this fact. Again, however, Plaintiff does not take issue with it.

2004. (Prior to October 1, 2002, Mr. Jordan was covered under the Health Plan as an employee.)

AR 0057.

Again, Plaintiff failed to elect or pay any premiums. Instead, he filed this lawsuit.

As the above facts show, it seems clear that Defendants made good faith efforts to allow Plaintiff to secure his COBRA benefits.

Finally, returning to the language of § 1132(c)(1)(A), quoted above, any amounts that might be awarded as either statutory damages or "other relief" are subject to the Court's discretion. Under the circumstances present, the Court should exercise its discretion not to award statutory damages or other relief.

## C. Attorney's Fees and Costs

Finally, Plaintiff seeks attorney's fees pursuant to 29 U.S.C. § 1132(g). That section permits the Court, in its discretion, to allow a reasonable attorney's fees and costs of the action to either party.

In view of the undersigned's conclusions and recommendations, the undersigned recommends that Plaintiff not be awarded attorney's fees and costs. The Court notes that Defendants have not requested an award of attorney's fees and costs.

## IV. Recommendation

For the foregoing reasons, the undersigned recommends that Plaintiff's "Motion for Judgment on the Administrative Record" (Docket No. 37) be DENIED, and that Defendants' "Cross Motion for Judgment on the Merits" (Docket No. 47) be GRANTED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this

42

Recommendation with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in this Report in which to file any response to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

E. Clifton Knowles
United States Magistrate Judge

43